# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**APRIL LYNN HARPER,**

    **Plaintiff,**

    v.

**Case No. 2:16-cv-690**
**JUDGE MICHAEL H. WATSON**
**Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, April Lynn Harper, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11) ("SOE"), the Commissioner's Memorandum in Opposition (ECF No. 16) ("Opposition"), Plaintiff's Reply (ECF No. 19) ("Reply"), and the administrative record (ECF No. 8). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge ("ALJ") under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## I.    BACKGROUND

Plaintiff filed her application for benefits on December 3, 2012, alleging that she has been disabled since January 26, 2011, due to interstitial cystitis, depression, broken right wrist, fibromyalgia/inflammation throughout the body, bleeding from the bladder, acid reflux, and high

blood pressure. (R. at 216–21, 240.) Plaintiff's application was denied initially and upon reconsideration. (R. at 132–40, 142–48). Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Patricia Witkowski Supergan ("ALJ") held a hearing on December 4, 2014, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 70–103.) On January 29, 2015, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 50–64.) On May 17, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–4.) Plaintiff then timely commenced the instant action.

## II.     HEARING TESTIMONY[1]

**A.     Plaintiff's Testimony**

Plaintiff testified at the administrative hearing on December 4, 2014, that she last worked as a lunch lady in 2011 and stopped working because she kept calling off due to stomach pain. (R. at 74–75.) Plaintiff testified that she is five foot, two inches tall, and weighs 205 pounds. (R. at 75.) At the time of the administrative hearing, Plaintiff had been married for twenty-seven years. (*Id.*) She has one child, a son, who is twenty-two years old and who no longer lives at home. (*Id.*)

Plaintiff and her unemployed husband share cleaning responsibilities, while he does most of the grocery shopping and Plaintiff does most of the cooking. (R. at 76.)

Plaintiff has an unrestricted driver's license, but her husband usually does the driving. (*Id.*) Plaintiff testified that she does not like to drive. (R. at 88.) Plaintiff has not taken any trips

---

[1] The Court limits its analysis of the evidence and the administrative decision to the issues raised in the SOE, *i.e.*, that the ALJ failed to properly consider Plaintiff's impairment of interstitial cystitis under SSR 02-2p and that the ALJ's credibility determination was deficient.

2

or vacations in the last few years, but she and her husband do visit their son approximately once a month in Barberton, Ohio, which is approximately two hours from her house. (R. at 76–77.) These visits consist of one-day trips. (R. at 77.) Plaintiff spends Thanksgiving with her sister-in-law, who lives across the road from where Plaintiff lives. (*Id*.) Plaintiff denied ever getting together with friends, keeping in touch with friends, or belonging to any clubs or social groups. (*Id*.) She does not ever go out to the movies or to lunch or dinner with anyone. (R. at 84.)

Plaintiff has a cell phone and has no problem using it and sending text messages to her mother. (R. at 77.) She also uses Facebook on her phone every day. (R. at 79.) Plaintiff does not use a computer. (R. at 78.)

Plaintiff smokes a pack of cigarettes a day and uses marijuana a couple of times a month. (R. at 78–79.) She last used marijuana the day before hearing. (R. at 79.) Plaintiff last drank one glass of wine at her son's wedding a few months before the hearing and has never used cocaine, meth, or heroin. (*Id*.)

In the twenty-four hours before the hearing, Plaintiff had taken her prescribed medications as well as aspirin "a little bit ago." (R. at 80.) She takes medications for cholesterol, high blood pressure, depression, and headaches. (*Id*.) Dr. Roth, who knows about her marijuana use, prescribed her antidepressants and she sees him every couple of months. (R. at 80–81.) Plaintiff also goes to counseling once or twice a week. (R. at 81.)

Plaintiff testified that the day before the hearing she ate leftovers for lunch and dinner, which came from a meal that she had cooked earlier. (R. at 82–83.)

When asked if she has any animals that she might take care of, Plaintiff testified that she has two dogs. (R. at 83.) Her husband takes them to the veterinarian. (*Id*.)

The day before the hearing, Plaintiff went to the doctor and watched movies. (*Id*.)

Plaintiff testified that when she coughs or sneezes, she wets herself, but she does not wear protective undergarments. (R. at 81.) When asked whether she has any problems with her interstitial cystitis, Plaintiff testified that when she becomes nervous or stressed out, "it really hurts." (R. at 85.) Plaintiff also explained that it hurts to wear pants because of the "tightness" and "pressure on" her stomach. (R. at 85–86.) Plaintiff testified that she goes to the bathroom twenty to thirty times a day. (R. at 86.)

Plaintiff has experienced headaches since she was a teenager. (R. at 86.) Plaintiff's doctor recently prescribed Topamax, which has helped her headaches. (*Id.*) She still gets headaches every day, but there are not as severe. (*Id.*) When she does have a bad headache, however, it can prevent her from doing household chores or personal care at least once a week even if she is taking Topamax. (R. at 86–87.) On days that she has a bad headache, she lies down with the lights off and keeps everything quiet. (R. at 87.) Plaintiff testified that her doctor recently increased her Topamax prescription to 100 milligrams twice a day. (*Id.*)

**B.      Vocational Expert Testimony**

Amy Mowry testified as a vocational expert ("VE") at the December 4, 2014, administrative hearing. (R. at 97–102.) The VE classified Plaintiff's past relevant work as follows: lunch person (which is classified as a child nutrition aide), a light, semi-skilled position; cashier, a light, semi-skilled position; and store laborer, a medium, unskilled position. (R. at 98–99.)[2] The ALJ proposed a hypothetical question regarding an individual with Plaintiff's age, education, past employment, and the residual functional capacity ("RFC") she ultimately assessed for Plaintiff. (R. at 99–100.) The VE testified that the hypothetical individual could perform the following work: "cleaner housekeeping," with 20,000 jobs in the

---

[2] According to the VE, Plaintiff describes her work as a lunch person at the medium exertional level and her work as a store laborer at the heavy exertional level. (*Id.*)

state economy and 377,000 jobs in the national economy; "cashier 2," with 48,000 jobs in the state economy and one million jobs in the national economy; and hand packager, with 7,700 in the state economy and 129,000 in the national economy. (*Id.*)

The ALJ next proposed the same hypothetical individual, but limited the individual to work at the sedentary level of exertion. (R. at 100.) The VE testified that the hypothetical individual could perform the following work: preparer, with 3,700 jobs in the state economy and 98,000 jobs in the national economy; final assembler, with 1,200 jobs in the state economy and 28,000 jobs in the national economy, and server, with 1,600 jobs in the state economy and 23,400 in the national economy. (*Id.*)

The VE went on to testify that one absence or less per month would be tolerated in a competitive work environment. (R. at 100–01.) According to the VE, there are typically two fifteen-minute breaks and one thirty-minute break in a competitive work environment. (R. at 101.) The VE denied that there would be competitive work for someone who was off task twenty-five percent of a work day, explaining that employer tolerances were up to fifteen percent off task in an eight-hour day. (*Id.*)

On cross-examination, Plaintiff's counsel asked whether employers would accept if an individual required more breaks to utilize the restroom at least once an hour, which is in addition to the breaks generally tolerated. (*Id.*) The VE testified "[r]outinely exceeding the normal breaks would result in a behavioral issue, and eventually, they will be terminated after three occurrences." (*Id.*) Plaintiff's counsel next asked if unskilled employers would tolerate an individual who, at the end of the training period, is not able to independently perform the job task with at least more than occasional interaction with a supervisor or questioning a supervisor.

(R. at 102.) The VE testified that that would be a behavior issue, and after approximately three occurrences, typically, the employee would be terminated. (*Id*.)

**C.     Medical Expert Testimony**

Ashok Jilhewar, M.D., testified as an independent medical expert at the December 4, 2014, administrative hearing. (R. at 88–97.) Dr. Jilhewar testified that Plaintiff's medically determinable impairments from January 26, 2011, to December 31, 2013, included interstitial cystitis, with supra pubic pain and with symptoms of mixed incontinence; stress incontinence; moderate to extreme obesity; and Colle's fracture of the right wrist (resolved). (R. at 89–92.) Dr. Jilhewar also testified that although Plaintiff had been prescribed Topamax, which is prescribed to prevent migraine attacks, he did not see any specific descriptions of Plaintiff suffering from such acute migraine attacks or any hospitalizations with headaches. (R. at 92.) Dr. Jilhewar testified that Plaintiff suffered from hypertension and had been prescribed medications to treat this condition. (R. at 92–93.) According to Dr. Jilhewar, Plaintiff had been diagnosed with enthesopathy and had been prescribed differing doses of Prednisone, but did not have any further follow-up. (R. at 93.) While fibromyalgia was mentioned in Plaintiff's application, Dr. Jilhewar did not find any diagnostic information or treatment of fibromyalgia or treating exam documenting tender points. (*Id*.) X-rays of both shoulders and a left angle were normal, but x-rays of hips revealed mild demyelination. (*Id*.)

According to Dr. Jilhewar, none of these impairments met or equaled any listings. (R. at 94.) However, Dr. Jilhewar went on to testify that "[t]he listing I would considered was 11.203 regarding the interstitial cystitis. It is a chronic pain syndrome. The disease is also known as bladder pain syndrome, and the most consistent listing are chronic pain." (*Id*.)

Dr. Jilhewar offered two opinions as to Plaintiff's RFC, depending on whether the ALJ considered Plaintiff's pain as significant in the absence of intensity of management of pain in the medical record. (*Id.*) If her pain is significant, Plaintiff is limited to sedentary work, but if the pain is not significant, then she is limited to light work. (*Id.*) Dr. Jilhewar testified that Plaintiff did not need an assistive device to ambulate and that her lifting/carrying capacity limits her pushing/pulling capacity. (R. at 94–95.) According to Dr. Jilhewar, Plaintiff can never climb ladders, ropes, or scaffolds because of moderate to extreme obesity. (R. at 95.) He did not have any specific clinical findings to limit the use of her upper extremities and there was no information to believe that visual function, hearing function, communication, or environmental limitations were necessary. (*Id.*)

Upon cross-examination, Plaintiff's counsel asked whether it would be probable that someone like Plaintiff with a history of interstitial cystitis may have continued frequency of urination with time. (R. at 96.) Dr. Jilhewar testified as follows:

> If you use the wor[d] may or approximate, the answer is definitely yes, and I was looking for medical record documentation of the frequency and/or urination in the night, and I do not have any in the medical record. That doesn't mean Claimant doesn't have it. I just don't have the document.

(*Id.*) When Plaintiff's counsel asked whether there is objective finding for Plaintiff's complaints of frequency even though there's no documentation or frequency in the record, Dr. Jilhewar responded as follows: "I can explain the frequency. Whether the Claimant has the frequency or not, I do not know the answer at present." (R. at 96–97.)

### III.     MEDICAL RECORDS

**A.    Medical Records Prior to Alleged Onset Date**

Prior to her alleged onset date of January 26, 2011, Plaintiff's medical records reflect a history of bladder and abdominal problems, including cystoscopy operations for hematuria and

7

left renal pelvis (R. at 438–61), a vaginal sling operation for stress urinary incontinence on May 6, 2008 (R. at 423–34), and emergency room treatment for chronic abdominal pain, left flank pain, back pain, and kidney stones (R. at 397–408, 464–508). On June 7, 2010, Plaintiff was diagnosed with interstitial cystitis with urgency and frequent urination, and pelvic pain, and underwent a cystoscopy. (R. at 390–94, 557). On July 26, 2010, Plaintiff reported improvement through medications and modification of her diet. (R. at 552.)

**B.      Christopher D. Rooney, M.D.**

In February 2011, Christopher D. Rooney, M.D., reported that Plaintiff suffered from chronic interstitial cystitis. (R. at 549–51.) He ordered modification of her diet and weekly bladder instillation treatment. (*Id*.)

**C.      Emergency Room Records**

In September 2011, Plaintiff presented for emergency treatment at Southeastern Ohio Regional Medical Center for a urinary tract infection with resultant lip discoloration, shaking, shortness of breath, constipation, slight dysuria, elevated temperature, nausea, vomiting, headache, and photophobia. (R. at 563–65.)

In July 2013, Plaintiff presented at Selby General Hospital for emergency treatment of a urinary tract infection and resultant fever, nausea, and body aches. (R. at 633–38.)

**D.      Joseph P. Burick, D.O.**

On January 10, 2012, Plaintiff presented to Joseph P. Burick, D.O., complaining of fever, dizziness, and vomiting. (R. at 573.) Plaintiff denied any dysuria urgency or frequency. (*Id*.) Dr. Burick assessed her with acute sinusitis and prescribed medication. (R. at 574.)

In December 2012, Dr. Burick saw Plaintiff for frequent headaches and sought a letter from Dr. Burick regarding her request for Social Security disability benefits relating to her

interstitial cystitis. (R. at 341–43.) Dr. Burick reported that Plaintiff had stopped taking most of her medications because she cannot afford them. (R. at 341.) Dr. Burick noted that Plaintiff presented an isolated incident of high blood pressure and prescribed hydrochlorothiazide. (R. at 342.) Dr. Burick reported that Plaintiff "stated she needed a note that she was unable to work she did not bring any other material" so Dr. Burick was unsure he could simply say that Plaintiff was unable to work. (*Id*.)

**D.     Tony Starr, D.O.**

On July 1, 2014, Plaintiff presented to Tony Starr, D.O., complaining of daily headaches, leg swelling, and pain throughout her body. (R. at 599–601.) Dr. Starr noted interstitial cystitis and reported that Plaintiff smoked a pack of cigarettes a day. (R. at 599.) Upon examination of her abdomen, Dr. Starr reported positive bowel sounds, no bruits, soft and nondistended with no tenderness or masses. (R. at 600.) Dr. Starr assessed Plaintiff with a headache, benign hypertension, a depressive disorder, and espophageal reflux. (*Id*.) He prescribed medications, including Topamax, and a follow-up examination in three weeks. (*Id*.)

On July 23, 2014, Plaintiff presented to Dr. Starr for her follow-up examination. (R. at 602–04.) Plaintiff reported moderately severe daily headaches and left hip and thigh pain. (R. at 602.) Upon examination, Dr. Starr noted that Plaintiff's mobility was unchanged and that she walked with a normal gait for her age. (R. at 602–03.) Plaintiff's abdomen continued to have positive bowel sounds, no bruits, soft, nontender, and nondistended with no palpable abdominal masses, aneurysms, or hernias present. (R. at 603.) In addition to his prior assessments, Dr. Starr assessed Plaintiff with enthesopathy of hip region. (*Id*.) Dr. Starr prescribed medications, including an increased Topamax prescription, and ordered that she follow up in three months. (R. at 603–04.)

On October 23, 2014, Dr. Starr examined Plaintiff for her three-month follow-up visit. (R. at 653–55.) Dr. Starr reported that Plaintiff's hypertension has been well controlled and that she is taking medication as prescribed. (R. at 653.) Upon examination, Dr. Starr noted that Plaintiff appeared healthy and well developed, that her mobility was unchanged, that she had a normal gait and posture. (R. at 654.) Dr. Starr further noted that Plaintiff's abdomen was again soft, nontender, nondistended with positive bowel sounds and no palpable masses, aneurysms, or hernias. (*Id.*)

### E. State-Agency Evaluations

On February 28, 2013, state-agency physician Jeffrey Vasiloff, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. (R. at 104–15.) Dr. Vasiloff opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday. (R. at 111.) According to Dr. Vasiloff, Plaintiff could frequently climb ramps/stairs, kneel or crawl; never climb ladders, ropes, or scaffolds; balance for an unlimited period; and frequently stoop, kneel, crouch, and crawl. (R. at 111–12.) Dr. Vasiloff found Plaintiff partially credible, explaining that that the severity of her allegations is not consistent with the totality of the evidence. (R. at 110.)

Leanne M. Bertani, M.D., reviewed Plaintiff's records upon reconsideration on April 29, 2013, and agreed with Dr. Vasiloff's assessment. (R. at 117–27.)

### IV. ADMINISTRATIVE DECISION

On January 29, 2015, the ALJ issued her decision. (R. at 50–64.) The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31,

2013. (R. at 52.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity during the period from her alleged onset date of January 26, 2011, through her date last insured of December 31, 2013. (R. at 52.)

At step two, the ALJ determined that through the date last insured, Plaintiff had the severe impairments of interstitial cystitis, obesity, and headaches. (*Id.*)

At step three, the ALJ next found that through Plaintiff's date last insured, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 57–58.) In connection with the finding, the ALJ explained why Plaintiff's interstitial cystitis did not meet or medically equal a listing:

> With regard to the claimant's interstitial cystitis, there is no listing which specifically addresses interstitial cystitis. However, pursuant to SSR 02-2p, interstitial cystitis will meet the requirements of a listing if the claimant has another impairment that, by itself, meets the requirements of a listing. In addition, the claimant meets a listing if there is an impairment that, in combination with interstitial cystitis, meets the requirements of a listing. In this case, independent medical expert, Dr. Ashok Jilhewar, concluded at the hearing

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

11

that a review of the medical records in the file did not support a finding that the claimant meets or medically equals a listing. Based on a review of the record as a whole, the undersigned finds that the claimant has not provided objective medical evidence of an impairment that by itself or in combination with interstitial cystitis meets or medically equals a listing.

(R. at 57.)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as define in 20 CFR 404.1567(b) except she could frequently climb ramps and stairs, but never ladders, ropes or scaffolds; frequently balance and stoop, but never kneel, crouch, or crawl; tolerate occasional exposure to and work around extreme cold and heat, hazards such as moving machinery or unprotected heights; and she was limited to the performance of unskilled work tasks that can be learned by demonstration or in 30 days or less, and that are of a simple, repetitive and routine nature.

(R. at 58.)

In assessing the foregoing RFC, the ALJ assigned "significant weight" to Dr. Jilhewar's opinion that Plaintiff should be limited to light work with additional postural restrictions if the ALJ found Plaintiff's pain less significant. (R. at 61.) The ALJ explained that

the evidence and Dr. Jilhewar's evidentiary analysis and thorough testimony support a finding that the claimant can perform light work. Additionally, Dr. Jilhewar had the opportunity to review all of the evidence in the record, and he has an understanding of social security disability programs and the evidentiary requirement, which are both factors lending credibility to Dr. Jilhewar's opinion.

(R. at 61.) However, the ALJ assigned "little weight" to Dr. Jilhewar's opinion that Plaintiff does not require environmental limitations because it did not appear that Dr. Jilhewar accounted for Plaintiff's subjective complaints of hot flashes, headaches, or other effects of Plaintiff's obesity. (*Id.*) The ALJ therefore limited Plaintiff to "occasional exposure to extreme cold and heat, workplace hazards such as moving machinery or unprotected heights, and unskilled work tasks that are of a simple, repetitive and routine nature." (*Id.*)

The ALJ next assigned the opinions of the state agency consultants, Drs. Bertani and Vasiloff, "significant weight" to "the extent they are consistent" the ALJ's articulated RFC. (*Id*.) The ALJ explained that she accorded significant weight to these doctors' opinions in this regard because "their assessments are consistent with the overall evidence in the record, and" because they are "highly qualified physicians who are experts in the Social Security disability programs and its rules as well as in the evaluation of medical issues in disability claims under the Act." (R. at 61–62.) Nevertheless, the ALJ went on to assign "little weight" to these doctors' opinions to the extent they recommend no environmental limitations and frequent exposure to crouching, kneeling, crawling, and unlimited balancing. (R. at 62.) The ALJ explained that Drs. Bertani and Vasiloff "did not appropriately consider the full extent of limitations that the claimant's condition pose, in particular her obesity and headaches[,]" justifying the greater environmental and postural limitations contained in the ALJ's articulated RFC. (*Id*.)

The ALJ also found Plaintiff's testimony regarding the extent of her symptoms and limitations to be not fully credible. (R. at 59.) The ALJ then offered a detailed discussion of the objective medical evidence in the record, including a discussion of physical examination findings, gaps in treatment, and Plaintiff's noncompliance with her medication regimen. (R. at 59–60.) The ALJ also considered Plaintiff's ability to perform daily activities, which the ALJ concluded undermined Plaintiff's claim of disability, "especially in light of her testimony of severe incontinence." (R. at 60.)

Relying on the VEs' testimony, the ALJ concluded that Plaintiff cannot perform past relevant work as a child nutritionist/food-management aide or cashier checker. (R. at 62.) However, the ALJ went on to find that Plaintiff can perform other jobs existing in significant

numbers in the national economy.  (R. at 63–64.)  She therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 64.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

Plaintiff advances two contentions of error. The Court finds Plaintiff's first assignment of error—that the ALJ failed to properly consider Plaintiff's impairment of interstitial cystitis under SSR 02-2p[4]—to be meritorious.[5]

SSR 02-2p explains that there is no listing for interstitial cystitis. SSR 02-2p, ¶ 8, 2002 WL 32063799 (Nov. 5, 2002). Interstitial cystitis, "when accompanied by appropriate symptoms, signs, and laboratory findings, is a medically determinable impairment that can be the basis for a finding of 'disability.'" *Id.* at Introduction. Like fibromyalgia, interstitial cystitis affects mostly women and its symptoms may vary:

> IC is a complex, chronic bladder disorder characterized by urinary frequency, urinary urgency, and pelvic pain. IC occurs most frequently in women (about 10 times more often than in men), and sometimes prior to age 18. IC may be associated with other disorders, such as fibromyalgia, chronic fatigue syndrome, allergies, irritable bowel syndrome, inflammatory bowel disease, endometriosis, and vulvodynia (vulvar/vaginal pain). IC also may be associated with systemic lupus erythematosus.
>
> The symptoms of IC may vary in incidence, duration, and severity.

*Id.* at ¶ 1. SSR 02-2p instructs that interstitial cystitis may be a consideration in both the "meets" and "equals" determinations at step three of the sequential evaluation and that interstitial cystitis

---

[4] Plaintiff notes that SSR 02-2p was rescinded six weeks after the ALJ's decision and was replaced with SSR 15-1p. (SOE at 10.) Plaintiff explains that the SSRs are not significantly different and will confine her arguments to SSR 02-2p. (*Id.*) Because the Commissioner's arguments are likewise limited to SSR 02-2p (Opposition at 5 n.5), the Court will do the same.
[5] Because this finding obviates the need for analysis of Plaintiff's remaining assignment of error as to Plaintiff's credibility, the Undersigned need not, and does not resolve whether this alternative base supports reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignment of error if appropriate. *Cox v. Comm'r of Soc. Sec.*, No. 2:13-cv-1203, 2015 WL 1000648, at *3 n.1 (S.D. Ohio Mar. 5, 2015).

may also, by itself, be "medically equivalent to a listed impairment[.]" *Id*. at ¶ 8.

Here, after summarizing Plaintiff's medical records, Dr. Jilhewar answered whether any of Plaintiff's impairments met or equaled any listings or whether he considered any listings:

> I cannot consider any specific listing because of the lack of durational requirement on interstitial cystitis absent some medical record documentation or presence of fibromyalgia, absence of intractable headaches, migraines or otherwise in the medical records. The listing I would considered [sic] was 11.203 regarding the interstitial cystitis. It is a chronic pain syndrome. The disease is also known as bladder pain syndrome, and the most consistent listing are chronic pain.

(R. at 94.)

At step three, the ALJ acknowledged SSR 02-2p and noted that there was no listing that specifically addressed interstitial cystitis. (R. at 57.) The ALJ went on to find that Plaintiff's interstitial cystitis did not meet or medically equal a listing:

> In this case, independent medical expert, Dr. Ashok Jilhewar, concluded at the hearing that a review of the medical records in the file did not support a finding that the claimant meets or medically equals a listing. Based on a review of the record as a whole, the undersigned finds that the claimant has not provided objective medical evidence of an impairment that by itself or in combination with interstitial cystitis meets or medically equals a listing.

(*Id*.)

Plaintiff contends that the ALJ erred in her analysis at step three because, *inter alia*, Dr. Jilhewar referred to a listing, "11.203," which does not exist, arguing that "it is unclear what listing he was referencing and why." (SOE at 12.) The Commissioner "acknowledges that the medical expert's testimony was unclear and contained a mistake regarding the listings[,]" but insists that substantial evidence supports the ALJ's finding. (Opposition at 6–12.)

The Commissioner's assertion is unavailing. The ALJ's decision "must fairly set out the legal framework for the disability determination and support that determination with substantial evidence." *Chavis v. Astrue*, No. 2:11-cv-00917, 2012 WL 5306130, at *2 (S.D. Ohio Oct. 26,

16

2012).  Here, it is undisputed that Dr. Jilhewar referred to a listing that does not exist and that his testimony was unclear.  The ALJ relied on this testimony when finding that Plaintiff had not provided "objective medical evidence of an impairment that by itself or in combination with interstitial cystitis meets or medically equals a listing."  (R. at 57.)  Although the ALJ also stated that her finding at step three was "[b]ased on a review of the record as a whole," (*id*.) the Undersigned cannot conclude that substantial evidence supports her finding because she failed to follow the proper standards when she relied on Dr. Jilhewar's flawed testimony.  *See Collins v. Comm'r of Soc. Sec.*, No. 1:13cv756, 2014 WL 5308582, at *6 (S.D. Ohio Oct. 16, 2014) ("As with fibromyalgia, the diagnosis of 'severe' IC [interstitial cystitis] is not always disabling.  The difficulty in this case is that Dr. Fischer, the ME [medical expert] upon whom the ALJ so heavily relied, does not appear to have considered or even to have been familiar with the detailed guidance offered by SSR 02–2p.  That failure requires remand.").

The Commissioner attempts to distinguish *Collins*, arguing that, in this case, Plaintiff's counsel did not alert the ALJ to SSR 02-2p, that the ALJ still referred to SSR 02-2p before discussing Dr. Jilhewar's testimony, and denying that the ALJ relied heavily on Dr. Jilhewar's testimony.  (Opposition at 6.)  The Commissioner's arguments are not well taken.  It is undisputed that Dr. Jilhewar's testimony was unclear.  While the Commissioner contends that the ALJ referred to SSR 02-2p, that fact does not distinguish this case from *Collins*:  In both cases, the medical experts did "not appear to have considered or even to have been familiar with the detailed guidance offered by SSR 02-2p."  *Collins*, 2014 WL 5308582, at *6.  The ALJ's reliance on Dr. Jilhewar's flawed testimony requires remand.  *Id.*

Moreover, to the extent the Commissioner suggests that substantial evidence exists to support the ALJ's decision regarding interstitial cystitis even though the ALJ did not specifically

17

identify such evidence at step three, that assertion is not well taken.  The Undersigned must evaluate the ALJ's express findings and must not conduct a *de novo* review of her decision.  *See Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 468, 2006 WL 2472910, at *6 (6th Cir. 2006) ("This court may not review the case de novo, resolve conflicts in the evidence, or decide questions of credibility." (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)); *Steel v. Comm'r of Soc. Sec.*, No. 09–11658, 2010 WL 3037983, at *1 (E.D. Mich. July 30, 2010) ("A district court's review of an ALJ's decision is not *de novo* review.").  While it may be that Plaintiff's interstitial cystitis does not meet or equal a listing, the Undersigned is not a medical expert and cannot conclude that substantial evidence supports the ALJ's actual finding at step three when it was based on flawed medical expert testimony.

In sum, it is **RECOMMENDED** that Plaintiff's first contention of error be **SUSTAINED**.

## VII.    CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g).  Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**


Date: August 4, 2017                               s/ *Elizabeth A. Preston Deavers* _____
                                                   ELIZABETH A. PRESTON DEAVERS
                                                   UNITED STATES MAGISTRATE JUDGE